**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

ROBERT HANKINS,              )       C.A. No. 07-332 Erie
          Plaintiff        )
                                  )
      v.                      )       District Judge McLaughlin
                                  )       Magistrate Judge Baxter
JEFFERY BEARD, et al.,         )
          Defendants.     )

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

**I.      RECOMMENDATION**

It is respectfully recommended that:

       1.       Defendant Chris Meyer's Motion for Summary Judgment [Document # 115] be granted; and

       2.       The DOC Defendants' Motion for Summary Judgment [Document # 119] be granted in part and denied in part.

It is further recommended that Plaintiff be ordered to file an amended complaint pertaining solely to the remaining due process claim in this case, specifying the Defendants against whom such claim is asserted and the specific allegations against each.  All remaining Defendants not so named should then be dismissed from this case.

**II.      REPORT**

       **A.      Relevant Procedural History**

On December 3, 2007, Plaintiff Robert Hankins, a prisoner incarcerated at the State Correctional Institution at Albion, Pennsylvania ("SCI-Albion"), filed this civil rights action pursuant to 42 U.S.C. § 1983 against: (i) numerous named individuals employed by the Pennsylvania Department of Corrections (hereinafter collectively referred to as "DOC Defendants"); (ii) several unnamed Defendants; and (iii) Defendant Chris Meyer, a physician's assistant under contract with the DOC to perform medical services at SCI-Albion ("Meyer"). [Document # 1].

The DOC Defendants consist of:  Jeffery Beard, the DOC's Secretary of Corrections

("Beard"); William Stickman, the DOC's Deputy Secretary of Corrections ("Stickman"); Harry

Wilson, Superintendent at SCI-Fayette ("Wilson"); Mark Krysevig, Deputy Superintendent at

SCI-Fayette ("Krysevig"); Linda Harris, Deputy Superintendent at SCI-Fayette ("Harris"); Daniel

Burns, Deputy Superintendent at SCI-Fayette ("Burns"); Carol Scire, Secretary at SCI-Fayette

("Scire"); Mary Ann Kushner, Administrative Officer at SCI-Fayette ("Kushner"); Robert Bitner,

Chief Hearing Officer at the DOC ("Bitner"); Robert Tretinik, Health Care Administrator at SCI-

Fayette ("Tretinik"); Fred Maue, Chief Psychiatrist at the DOC ("Maue"); Darlene Linderman,

Mailroom Supervisor at SCI-Fayette ("Linderman"); John S. Shaffer, PhD, Executive Secretary

at the DOC ("Shaffer"); Michael Zaken, Unit Manager at SCI-Fayette ("Zaken"); Sharon Burks,

Chief Grievance Officer at the DOC ("Burks"); and the following corrections officers at SCI-

Fayette:  Major Eric Armel ("Armel"); Captain J. Forte ("Forte"); Captain Scott Nickelson

("Nickelson"); Captain Edward Manchas ("Manchas"); R. Klink ("Klink"); Lieutenant Sean

Nose ("Nose"); Lieutenant J. Kremposky ("Kremposky"); Lieutenant M. Mozingo ("Mozingo");

Lieutenant George Reposky ("Reposky"); Lieutenant Hooper ("Hooper"); Lieutenant Crumb

("Crumb"); Sergeant Rymarowicz ("Rymarowicz"); Sergeant Pete Slepinski ("Slepinski"); Mark

Mains ("Mains"); Clayton Stoner ("Stoner"); "Chapley;" "Beachy;" "Petrosky;" "Johnson;"

"Rohrabaugh;" "Haley;" M.C. Fisher ("Fisher"); Ronald Collings ("Collings"); Jeff L. Okorn

("Okorn"); "Burton;" "Holman;" "Richter;" Kevin Faulkner ("Faulkner"); Timothy Steeley

("Steeley"); and "Link"

On March 19, 2008, the DOC Defendants filed an Answer to Plaintiff's Complaint,

denying Plaintiff's allegations and asserting a number of affirmative defenses. [Document # 38].

Defendant Meyer, on the other hand, filed a motion to dismiss the Complaint on April 29, 2008,

arguing that Plaintiff's claims against him were barred by the applicable statute of limitations

and/or failed to state a claim upon which relief may be granted. [Document # 41].  In response to

Defendant Meyer's motion to dismiss, Plaintiff filed an amended complaint as to Defendant

Meyer only, in which Plaintiff added several allegations against Defendant Meyer, including a

new claim of retaliation and an expanded deliberate indifference claim. [Document # 49].

On July 2, 2008, Defendant Meyer filed a motion to dismiss Plaintiff's amended complaint, again arguing that Plaintiff's claims against him were barred by the applicable statute of limitations and/or failed to state a claim upon which relief may be granted. [Document # 55]. On February 12, 2009, this Court issued a Report and Recommendation ("R&R") recommending that Defendant Meyer's motion to dismiss be granted in part and denied in part, and recommending further that the unnamed Defendants be dismissed because that were not identified and served within the 120 day time period prescribed by Rule 4(m) of the Federal Rules of Civil Procedure. [Document # 98].  By Memorandum Order dated February 27, 2009, District Judge Sean J. McLaughlin adopted this Court's R&R.  As a result, the unnamed Defendants were dismissed from this case, and one of Plaintiff's claims against Defendant Meyer was dismissed as untimely; however, Plaintiff's retaliation and deliberate indifference claims against Defendant Meyer, arising from the alleged confiscation and failure to return or replace his knee brace, were allowed to proceed. [Document # 101].

The parties have since conducted discovery and both Defendant Meyer and the DOC Defendants have filed motions for summary judgment [Document ## 115 and 119, respectively]. Plaintiff has filed a consolidated response to Defendants' summary judgment motions. [Document # 137].  This matter is now ripe for consideration.


**B.      Plaintiff's Claims**

Plaintiff's original complaint consists of 45 pages of disjointed and often confusing allegations that attempt to set forth a multitude of claims against some or all of the 46 named Defendants.  From these allegations, the Court has construed the following claims:

> 1.      A Fourteenth Amendment due process claim against Defendants Beard, Shaffer, Maue, Stickman, Wilson, Harris, and Krysevig regarding his initial placement in the LTSU in April 2004 (Complaint at Section IV.C).
>
> 2.      A Fourteenth Amendment due process claim against the DOC

3

Defendants challenging his continuous confinement in disciplinary custody from April 2004 to the present. (Complaint at pp. 11-15, ¶¶ 1-17).

3.      An Eighth Amendment conditions of confinement claim regarding the time he spent in the LTSU and strip cells (Complaint at pp.12-15, ¶¶ 3-24).

4.      An equal protection claim that indigent Muslim inmates were denied the feast after fasting during the month of Ramadan (Complaint at p. 16, ¶¶ 25-26).

5.      An Eighth Amendment deliberate indifference claim arising from injuries he allegedly suffered from falling on ice in the exercise yard on or about December 2004, and, again, on December 5, 2005 (Complaint at pp. 16-17, ¶¶ 27-30).

6.      An Eighth Amendment deliberate indifference claim arising from the removal of his medically prescribed toothpaste (Complaint at pp. 17-18, ¶¶ 31-33).

7.      Eighth Amendment and retaliation claims against Defendant Johnson arising from his confiscation of Plaintiff's knee brace in or around February 2006 (Complaint at p. 18, ¶ 34).

8.      Denial of access to the courts and retaliation claims against Defendants Richter and Mozingo, arising from their alleged refusal to allow Plaintiff to attend court hearings (Complaint at pp. 18-19, ¶¶ 37-38).

9.      A claim that mail was improperly withheld from him in March 2005 (Complaint at pp. 19-20, ¶¶ 42-46).

10.     A First Amendment free speech claim that a letter sent by him in January 2006 was improperly returned to him "due to unlawful actions of DOC staff" (Complaint at pp. 20-21, ¶¶ 47-48).

11.     First Amendment free speech and retaliation claims against Defendant Crumb for opening Plaintiff's mail before returning it to him in or around October 2006 (Complaint at p. 21, ¶¶ 49-50).

12.     Equal protection claim against Defendant Zaken based upon his alleged confiscation of a religious newspaper that was sent to Plaintiff (Complaint at p. 21, ¶¶ 51-52).

13.     First Amendment free speech and retaliation claims against Defendants Zaken for allegedly confiscating and/or ordering staff to confiscate Plaintiff's incoming mail (Complaint at pp. 22-23, ¶¶ 52-57).

14.     A retaliation claim against Defendants Richter, Burton, Holman, Tift, and Mozingo alleging that they stole some of Plaintiff's

property and doused it in the shower, threw his underwear "upon the filthy tier," and stepped on his medically prescribed toothpaste (Complaint at p. 24, ¶ 62).

15. An Eighth Amendment claim that he was given food loaf as punishment (Complaint at p. 24, ¶ 64).

16. A claim that he was retaliated against for going on a "peaceful hunger strike" by forcing him to undergo a strip search each time he entered and exited his assigned cell (Complaint at p. 25, ¶¶ 66-68).

17. Access to courts and Eighth Amendment claims that Defendant Mains refused him commissary to contact legal counsel and the courts, and "verbally attacked" him in or around November 2005. (Complaint at pp. 25-26, ¶ 69).

18. Access to courts and retaliation claims that he was denied commissary and was, thus, unable to contact legal counsel and the courts on or about September 29, 2006, and November 23, 2006 (Complaint at pp. 26-27, ¶¶ 71-74).

19. An Eighth Amendment claim that he was placed in a "hard/stripped cell with a rubber floor rug placed against the bottom of his assigned cell door, while taped up and along the sides of said door," allegedly putting his health and safety at risk (Complaint at p. 27, ¶ 75).

20. A retaliation claim against Defendants Scire, Kushner, and Wilson for placing him on grievance restriction (Complaint at p. 27, ¶ 76).

21. A retaliation claim against Defendants Zaken, Wilson, Burns, Nickelson, and Krysevig for denying him the opportunity to speak to his dying mother (Complaint at pp. 28-29, ¶¶ 77-85).

22. A claim that Defendant Nose used excessive force against Plaintiff on May 9, 2006, allegedly causing an injury to his right knee (Complaint at p. 30, ¶ 86).

23. A claim that he was denied due process at "many misconduct hearings," which allegedly caused him to be placed in isolation for over six years (Complaint at p. 31, ¶ 87).

24. A claim that he was "viciously assaulted" by Defendants Hooper, Haley, Petrosky, Burton, Link and Rohrabaugh, while Defendants Zaken and Krysevig watched, on March 18, 2005 (Complaint at pp. 31-34, ¶¶ 88-98).

25. A claim that he was assaulted by Defendants Rymarowicz, Chapley, and Faulkner, on May 2, 2006 (Complaint at pp. 35-36, ¶¶ 100-105).

26.   A claim that he was assaulted by Defendants Mains, Stoner, Fisher, Steeley, Okorn, Collings, and Faulkner and/or Slepinski on December 6, 2005. (Complaint at pp. 37-39, ¶¶ 106-111).

In addition to the foregoing claims, Plaintiff's Amended Complaint sets forth retaliation and Eighth Amendment claims against Defendant Meyer related to the removal of, and alleged failure and/or refusal to replace, Plaintiff's knee brace, which claim survived Defendant Meyer's previous motion to dismiss. (Amended Complaint at ¶¶ 125-132).

### C.   Standards of Review

#### 1.   Summary Judgment

Federal Rule of Civil Procedure 56(c)  provides that summary judgment shall be granted if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Rule 56(e) further provides that when a motion for summary judgment is made and supported, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party."  Id.

A district court may grant summary judgment for the defendant when the plaintiff has failed to present any genuine issues of material fact.  See Fed.R.Civ.P. 56(c); Krouse v. American Sterilizer Co., 126 F.3d 494, 500 n.2 (3d Cir. 1997).  The moving party has the initial burden of proving to the district court the absence of evidence supporting the non-moving party's claims.  Celotex Corp. v. Catrett, 477 U.S. 317 (1986); Country Floors, Inc. v. Partnership Composed of Gepner and Ford, 930 F.2d 1056, 1061 (3d Cir. 1990).  Further, "[R]ule 56 enables a party contending that there is no genuine dispute as to a specific, essential fact 'to demand at least one sworn averment of that fact before the lengthy process of litigation continues.'" Schoch

6

v. First Fidelity Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990) quoting Lujan v. National Wildlife Federation, 497 U.S. 871 (1990).

The burden then shifts to the non-movant to come forward with specific facts showing a genuine issue for trial. Matsushita Elec. Indus. Co. v Zenith Radio Corp., 475 U.S. 574 (1986); Williams v. Borough of West Chester, Pa., 891 F.2d 458, 460-461 (3d Cir. 1989)(the non-movant must present affirmative evidence - more than a scintilla but less than a preponderance - which supports each element of his claim to defeat a properly presented motion for summary judgment). The non-moving party must go beyond the pleadings and show specific facts by affidavit or by information contained in the filed documents (i.e., depositions, answers to interrogatories and admissions) to meet his burden of proving elements essential to his claim. Celotex, 477 U.S. at 322; Country Floors, 930 F.2d at 1061.

A material fact is a fact whose resolution will effect the outcome of the case under applicable law. Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 248 (1986). Although the court must resolve any doubts as to the existence of genuine issues of fact against the party moving for summary judgment, Rule 56 "does not allow a party resisting the motion to rely merely upon bare assertions, conclusory allegation or suspicions." Firemen's Ins. Co. of Newark, N.J. v. DuFresne, 676 F.2d 965, 969 (3d Cir. 1982). Summary judgment is only precluded if the dispute about a material fact is "genuine," i.e., if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson, 477 U.S. at 247-249.

## 2.    *Pro Se* Pleadings

*Pro se* pleadings, "however inartfully pleaded," must be held to "less stringent standards than formal pleadings drafted by lawyers" Haines v. Kerner, 404 U.S. 519, 520-521(1972). If the court can reasonably read pleadings to state a valid claim on which the litigant could prevail, it should do so despite failure to cite proper legal authority, confusion of legal theories, poor syntax and sentence construction, or litigant's unfamiliarity with pleading requirements. Boag v.

7

MacDougall, 454 U.S. 364 (1982); United States ex rel. Montgomery v. Bierley, 141 F.2d 552, 555 (3d Cir. 1969)(petition prepared by a prisoner may be inartfully drawn and should be read "with a measure of tolerance"); Smith v. U.S. District Court, 956 F.2d 295 (D.C.Cir. 1992); Freeman v. Department of Corrections, 949 F.2d 360 (10th Cir. 1991). Under our liberal pleading rules, a district court should construe all allegations in a complaint in favor of the complainant. Gibbs v. Roman, 116 F.3d 83 (3d Cir.1997). See, e.g., Nami v. Fauver, 82 F.3d 63, 65 (3d Cir. 1996)(discussing Fed.R.Civ.P. 12(b)(6) standard); Markowitz v. Northeast Land Company, 906 F.2d 100, 103 (3d Cir. 1990)(same). Because Plaintiff is a *pro se* litigant, this Court will consider facts and make inferences where it is appropriate.

### D.     Discussion

#### 1.     Statute of Limitations

The federal civil rights laws do not contain a specific statute of limitations for § 1983 actions. However, it is well established that the federal courts must look to the relevant state statute of limitations for personal injury claims to determine the applicable limitations period. Sameric Corp. Del., Inc. v. City of Philadelphia, 142 F.3d 582 (3d Cir. 1998)(internal citations omitted). In this regard, federal courts sitting in Pennsylvania have adopted Pennsylvania's two year personal injury statute of limitations set forth at 42 Pa.C.S.A. § 5524, in determining that a § 1983 claim must be filed no later than two years from the date the cause of action accrued. See Lake v. Arnold, 232 F.2d 360, 368 (3d Cir. 2000); Urrutia v. Harrisburg County Police Dept., 91 F.3d 451 (3d Cir. 1996). Furthermore, a claim under § 1983 accrues when the plaintiff "knew or should have known of the injury upon which [his] claim is based." Sameric, 142 F.3d at 599.

Here, Plaintiff's original Complaint was filed on December 3, 2007; however, it was apparently signed by Plaintiff on November 12, 2007. Thus, for purposes of applying the statute of limitations, this Court will treat November 12, 2007, as the relevant filing date pursuant to the prison mailbox rule. See Commonwealth v. Castro, 766 A.2d 1283, 1287 (Pa.Super. 2001),

citing Commonwealth v. Little, 716 A.2d 1287 (Pa.Super. 1998)(in determining the date upon which a prisoner's pleading is filed, Pennsylvania applies the prison mailbox rule, which provides that the "date of delivery of [the pleading] by the [inmate] to the proper prison authority or to a prison mailbox is considered the date of filing of the [pleading]").  Accordingly, any claim concerning an injury of which Plaintiff "knew or should have known" prior to November 12, 2005, is barred by the statute of limitations.

Based on the foregoing, the following claims should be dismissed as untimely:

1. Plaintiff's due process claim against Defendants Beard, Shaffer, Maue, Stickman, Wilson, Harris, and Krysevig regarding the initial decision to place him in SCI-Fayette's LTSU, which occurred in April 2004;

2. Plaintiff's Eighth Amendment deliberate indifference claim related to his alleged fall on the ice in the exercise yard on or about December 16, 2004;

3. Plaintiff's claim that his mail was withheld from him in March 2005;

4. Plaintiff's claim the Defendant Mains refused him commissary and "verbally attacked" him in or around November 2005, to the extent this claim arose prior to November 12, 2005; and

5. Plaintiff's claim that he was assaulted by Defendants Hooper, Haley, Petrosky, Burton, Link, and Rohrabaugh on March 18, 2005.

In addition to the dismissal of the foregoing claims, it is recommended that Defendants Shaffer, Maue, Haley, Link, Rohrabaugh, and Petrosky be dismissed from this case, as the only allegations against these Defendants pertain solely to one or more of the foregoing claims.

### 2.     Eighth Amendment Claims

### a.     LTSU and Strip Cell Conditions of Confinement

Plaintiff complains that, while in the LTSU, he was subjected to "mental health patients who bang, yell, and make loud noise through the night, smear body waste and urine out of their assigned cells, and throw body waste and fluids on other prisoners." (Complaint at p. 12, ¶ 6).

Plaintiff also claims that "he was placed in strip cells on numerous occasions for seven days without ever receiving any of his personal properties back prior to the end of the seventh day." (Complaint at pp. 12-13, ¶ 8). As a result, Plaintiff claims that he was unable to brush his teeth and could not wash because he had no towel, wash rag, soap, or hot water. (Complaint at p. 13-14, ¶¶ 10, 14). In addition, Plaintiff claims that the strip cells were "freezing on many occasions" and made him feel humiliated, which caused him to lose sleep. (Complaint at p. 14, ¶ 18). He further complains that he was "denied any and all newspapers, books, magazines, publications and/or literature not legal or religious in nature," and was also denied "any and all photographs of his loved ones, friends and otherwise..." (Complaint at p. 15, ¶¶ 20-21).

To succeed on an Eighth Amendment claim based on prison conditions, a plaintiff must show "he has suffered an objectively, sufficiently serious injury, and that prison officials inflicted the injury with deliberate indifference." Farmer v. Brennan, 511 U.S. 825, 834 (1994) An objectively, sufficiently serious injury is one that denies the inmate "the minimal civilized measure of life's necessities," such as food, clothing, shelter, and medical care. Rhodes v. Chapman, 452 U.S. 337, 347 (1981); see also Tillman v. Lebanon County Correctional Facility, 221 F.3d 410, 419 (3d Cir. 2000); Young v. Quinlan, 960 F.2d 351, 364 (3d Cir. 1992)(holding that, at a minimum, correctional institutions must provide inmates with "adequate food, clothing, shelter, sanitation, medical care, and personal safety"). Furthermore, to establish deliberate indifference: 1) a prison official must know of and disregard an excessive risk to inmate health or safety; 2) the official must be aware of facts from which an inference could be drawn that a substantial risk of serious harm exists, and 3) the official must also draw the inference. Farmer, 511 U.S. at 837.

In the context of a conditions of confinement claim, the Honorable Lisa Pupo Lenihan recently observed that "[n]either classification nor confinement to segregation, either administrative or punitive, implicates the Cruel and Unusual Punishment Clause of the Eighth Amendment unless the conditions themselves are cruel and unusual." Brown v. Beard, 2:07-cv-

637, slip op. at * 16 (W.D.Pa. Mar. 9, 2009), citing Hutto v. Finney, 437 U.S. 678, 686 (1978);

Gibson v. Lynch, 652 F.2d 348, 352 (3d Cir. 1981)("administrative segregation and solitary

confinement do not, in and of themselves, constitute cruel and unusual punishment").  Judge

Lenihan remarked further that institutions housing "persons convicted of serious crimes cannot

be free of discomfort." Brown, slip op. at * 17 (citations omitted).  In this regard, Judge Lenihan

upheld the conditions in the SMU and LTSU in the face of an Eighth Amendment challenge,

citing with approval the Pennsylvania Superior Court's decision in Rivera v. Pennsylvania

Department of Corrections, 827 A.2d 525 (Pa.Super. 2003), which rejected an Eighth

Amendment challenge to conditions of confinement in the LTSU based upon allegations

substantially similar to Plaintiff's challenge in this case.  In particular, the Rivera court observed

and upheld the following conditions that existed in the LTSU:

> The LTSU ... is potentially a stay of indefinite duration for the
> inmate.
>
> The basic conditions in this most restrictive of units designed for the
> most severe behavioral problems are, perhaps not surprisingly, very
> unpleasant.
>
> The inmates are not allowed most types of personal property,
> newspapers, leisure books, radio, television, visits, or participation in
> educational or religious programs.  They are confined in a solitary cell
> for twenty-four hours a day.  Three showers a week are allowed and one
> hour of exercise a day, five days a week.  There are limited library
> privileges and it is not open on the weekends.
>
> There is a regular problem of feces throwing and the accompanying
> stench, which has been recently only partially corrected by a
> modification of the cell doors.  Another practice of stopping up toilets
> until they run over and flood the cells, is not uncommon and can lead to
> similar unsanitary conditions.  Although the institution has a specialized
> team to go in and clean and sanitize after such incidents, the evidence
> suggests that there are sometimes period of delay during which the
> inmates are residing and even eating their meals within the sight and
> smell of human waste...
>
> ....  There is considerable noise described as banging and screaming in
> the unit at all hours of the day and night and the lights are left on twenty-
> four hours a day.  Many of the inmates are described as suffering from
> mental or emotional illnesses, although the severely mentally ill are
> apparently housed in a separate unit.

> There have been problems with the heat during which the cells have
> been quite cold during the winter months, although extra blankets appear
> to have been available at those times....  At times, pepper spray is used to
> control unruly inmates, and the spray lingers in the air, causing problems
> for the surrounding inmates.
>
> This Court would expect the conditions on such a unit to be even less
> pleasant than the rest of the prison, and that few privileges, comforts or
> amenities will be available, as the LTSU is disciplinary custody and is
> intended to be punitive.

Rivera, 837 A.2d at 529-32.

Here, Plaintiff is complaining about conditions virtually identical to those found to be consistent with the Eighth Amendment in Brown and Rivera.  As a result, the DOC Defendants should be granted summary judgment with regard to Plaintiff's Eighth Amendment claim in this regard, to the extent such claim is not already barred by the applicable statute of limitations.

### b.  Food Loaf

Plaintiff alleges that Defendants Hooper, Kremposky, and "several others" punished him by placing him on food loaf for seven days at a time on several occasions. (Complaint at p. 24, ¶ 64).  It is well settled that prisoners are entitled to a nutritionally adequate diet.  Laufgas v. Speziale, 263 Fed. Appx. 192, 198 (3d Cir. 2008), citing Ramos v. Lamm, 639 F.2d 559, 571 (10th Cir. 1980).  The Eighth Amendment requires that prison officials  serve "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." Ramos, 639 F.2d at 571.  Here, however, Plaintiff does not assert that his meals were prepared or served in a manner that jeopardized his health.  Instead, Plaintiff is simply complaining that he was unjustly placed on a food loaf diet.  This is insufficient to establish an Eighth Amendment claim.

It has been widely held that placing an inmate on a food loaf diet, even for a seven day period of time, does not present a viable Eighth Amendment claim.  See, e.g., Lane v. Culp, 2007 WL 954101 at * 4 (W.D.Pa. Mar. 28, 2007)("providing an inmate with a food loaf for seven days is not a violation of the Eighth Amendment"), citing Gates v. Huibregtse, 69 Fed.Appx. 326 (7th

Cir. 2003); <u>Adams v. Kincheloe</u>, 743 F.Supp. 1385, 1391 (E.D.Wash. 1990).  <u>See also</u> <u>LeMaire</u>
<u>v. Maass</u>, 12 F.3d 1444, 1456 (9th Cir. 1993)(temporary nutra-loaf diet does not violate Eighth
Amendment).  Accordingly, Defendants should be granted summary judgment with regard to
Plaintiff's Eight Amendment claim that he was served food loaf as punishment.

### c.      Rubber Floor Rug

Plaintiff claims that unspecified DOC Defendants put his health and safety at risk by
placing him in a "hard/stripped cell with a rubber floor rug placed against the bottom of his
assigned cell door, while taped up and along the sides of said door." (Complaint at p. 27, ¶ 75).
In response to this claim, Defendants have submitted several affidavits explaining that "inmates
in the LTSU had a propensity for flooding their cells and also would pass contraband from one
cell to another under their cell doors."  (<u>See</u> Declaration of Sean Nose attached as Exhibit 24 to
Document # 120 ("Nose Declaration"), at ¶ 15; Declaration of Daniel Hooper attached as Exhibit
25 to Document # 120 ("Hooper Declaration"), at ¶ 8; Declaration of Joseph Kremposky attached
as Exhibit 35 to Document # 120 ("Kremposky Declaration"), at ¶ 11; Declaration of Scott
Nickelson attached as Exhibit 38 to Document # 120 ("Nickelson Declaration"), at ¶ 8).  As a
result, rubber rugs were placed outside some of the cells in the LTSU in an attempt to prevent
inmates from passing contraband. (<u>See</u>, <u>e.g.</u>, Hooper Declaration at ¶ 9; Kremposky Declaration
at ¶ 12; Nickelson Declaration at ¶ 9).  The institution's fire safety officer viewed the placement
of the rubber rugs and found it to be acceptable under applicable fire and safety codes. (<u>See</u>
Declaration of Harry Wilson attached as Exhibit 31 to Document # 120 ("Wilson Declaration"),
at ¶ 11).  Furthermore, each cell in the LTSU had a sprinkler, and the hard cells had a back door
to a self-contained exercise yard. (<u>See</u> Hooper Declaration at ¶ 11; Kremposky Declaration at ¶
14; Nickelson Declaration at ¶ 11).

The foregoing evidence produced by Defendants refutes Plaintiff's claim that his health
and safety were put at risk by the placement of the rubber rugs, as alleged.  Thus, the DOC

13

Defendants should be granted summary judgment with regard to such claim.

### d.      Ice in the Exercise Yard

Plaintiff claims that, despite his prior complaints regarding "large sheets of ice" in the exercise yard, unspecified DOC Defendants failed to "properly address the matter" and, as a result, Plaintiff fell and injured himself on the ice while being escorted to the exercise yard on December 5, 2005. (Complaint at pp. 16-17, ¶¶ 27-29).  Accordingly, Plaintiff complains that the DOC Defendants were deliberately indifferent to his health and safety.

Plaintiff's claim in this regard is akin to the claim that was raised by the plaintiff in Reynolds v. Powell, 370 F.3d 1028 (10th Cir. 2004).  In Reynolds, the inmate plaintiff slipped and fell on standing water that had accumulated in a depression in the floor outside the prison shower area.  The plaintiff in Reynolds alleged that he had warned the defendants about the water problem several times before he was injured, and specifically warned them that he was at a heightened risk because he was required to use crutches as a result of a previous injury. Reynolds, 370 F.3d at 1030.  Nevertheless, the Tenth Circuit Court concluded that, "while the standing-water problem was a potentially hazardous condition, slippery floors constitute a daily risk faced by members of the public at large....  Consequently, we conclude, as a matter of law, that the hazard encountered by plaintiff was no greater than the daily hazards faced by any member of the general public who is on crutches, and that there is nothing special or unique about plaintiff's situation that will permit him to constitutionalize what is otherwise only a state-law tort claim." Id. at 1030, 1032.  See also LeMaire v. Maass, 12 F.3d 1444, 1457 (9th Cir. 1993)(noting that "slippery prison floors ... do not state even an arguable claim for cruel and unusual punishment")(quotation omitted); Denz v. Clearfield County, 712 F.Supp. 65, 66 (W.D.Pa 1989)(finding no Eighth Amendment violation based on slippery floor in prison cell, despite prison officials alleged knowledge of the hazard); Robinson v. Cuyler, 511 F.Supp. 161, 162-63 (E.D.Pa. 1981)(finding no Eighth Amendment violation based on slippery prison dining

hall); <u>Wedemeyer v. City of Williston Unknown Transport Officers</u>, 2007 WL 1855050 (D.N.D. 2007)(dismissing an inmate's complaint that law enforcement personnel were deliberately indifferent to his health by forcing him to wear shower shoes while being transported outside in icy conditions, thus causing him to slip and fall).

Simply stated, "[a] 'slip and fall,' without more, does not amount to cruel and unusual punishment....  Remedy for this type of injury, if any, must be sought in state court under traditional tort law principles." <u>Mitchell v. West Virginia</u>, 554 F.Supp. 1215, 1217 (N.D.W.Va. 1983).  Accordingly, the DOC Defendants should be granted summary judgment with regard to Plaintiff's Eighth Amendment claim in this regard.


### e.      Medical Claims

Plaintiff asserts two deliberate indifference to serious medical need claims:  (i) a claim against Defendants Meyer and Johnson arising from the confiscation of, and failure to return or replace, Plaintiff's knee brace, and (ii) a claim regarding the removal of his allegedly medically-prescribed toothpaste.

In the medical context, a constitutional violation under the Eighth Amendment occurs only when state officials are deliberately indifferent to an inmate's serious medical needs.  <u>Estelle v. Gamble</u>, 429 U.S. 97 (1976).  "In order to establish a violation of [the] constitutional right to adequate medical care, evidence must show (i) a serious medical need,[1] and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need."  <u>Rouse v. Plantier</u>, 182 F.3d 192, 197 (3d Cir. 1999).

Deliberate indifference to a serious medical need involves the "unnecessary and wanton infliction of pain." <u>Estelle</u>, 429 U.S. at 104.  Such indifference is manifested by an intentional

---

[1]

A serious medical need is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention."  <u>Monmouth County Correction Institute Inmates v. Lanzaro</u>, 834 F.2d 326, 347 (3d Cir. 1987).

refusal to provide care, delayed medical treatment for non-medical reasons, denial of prescribed medical treatment, a denial of reasonable requests for treatment that results in suffering or risk of injury,  Durmer v. O'Carroll, 991 F.2d 64, 68 (3d Cir. 1993), or "persistent conduct in the face of resultant pain and risk of permanent injury"  White v. Napoleon, 897 F.2d 103, 109 (3d Cir. 1990).

Mere misdiagnosis or negligent treatment is not actionable as an Eighth Amendment claim because medical malpractice is not a constitutional violation.  Estelle, 429 U.S. at 106. "Indeed, prison authorities are accorded considerable latitude in the diagnosis and treatment of prisoners." Durmer, 991 F.2d at 67 (citations omitted).

### i.     Knee Brace Claim

Plaintiff claims that in February 2006, Defendant Johnson confiscated his medically-prescribed knee brace and refused to return it to him. (Complaint at p. 18, ¶ 34).  Plaintiff claims further that he saw Defendant Meyer after his knee brace was confiscated, at which time Defendant Meyer allegedly told Plaintiff that "he would personally see to it that plaintiff don't [sic] receive the knee brace." (Amended Complaint at ¶ 128).  Nevertheless, Plaintiff claims that Defendant Meyer subsequently informed him that he would be receiving the prescribed knee brace; yet, he had not received it as of the date of filing his Amended Complaint. (Amended Complaint at ¶ 130-31).

Both Defendants assert that Plaintiff cannot meet his burden of proving his claim in this regard because he has failed to proffer any expert testimony demonstrating that their alleged actions or inactions caused or contributed to an actual injury.  The Court agrees.

"A plaintiff alleging constitutionally inadequate medical treatment must submit medical evidence of a 'serious medical need' sufficient to satisfy the objective component of the [deliberate indifference] test."  Harris v. Herbik, 2007 WL 4561480 (W.D.Pa. Dec. 20, 2007), citing Spruill v. Gillis, 372 F.3d 218, 236 (3d Cir. 2004); Boring v. Kozakiewicz, 833 F.2d 468

(3d Cir. 1987), <u>cert</u>. <u>denied</u>, 485 U.S. 991 (1988).  In <u>Boring</u>, the Third Circuit Court explained that expert testimony would not necessarily be required in situations where the seriousness of injury or illness would be apparent to a lay person, *e.g.*, a gunshot wound.  <u>Boring</u>, 833 F.2d at 473, <u>citing</u> <u>City of Revere v. Massachusetts General Hosp.</u>, 463 U.S. 239 (1983).  However, the Third Circuit found that, with regard to an ulnar nerve injury, migraine headaches, and a prior knee injury, a fact finder would not be able to determine that such conditions were 'serious' because the need for treatment did not appear to be 'acute.'  <u>Id</u>.  Under such circumstances, the <u>Boring</u> court concluded that the district court  properly required expert medical opinion and, in its absence, properly withdrew the issue from the jury. <u>Id</u>. at 474 (citations omitted).

Here, Plaintiff has not produced any medical evidence to substantiate the existence of a serious medical need for a knee brace.  The medical evidence of record indicates that Defendant Meyer ordered an x-ray of Plaintiff's right knee on December 16, 2004, and, on the same date, prescribed a knee wrap for a period of ten days, pending the results of the x-ray. (Document # 118, Exhibit 2 at p. 45).  The x-ray was subsequently conducted on January 4, 2005, the results of which revealed only mild degenerative joint disease. (Document # 118, Exhibit 3 at p. 2). There is no indication in the medical records that the prescription for the knee wrap was continued beyond the original ten days.  In fact, the records indicate that Plaintiff did not complain of right knee pain again until February 21, 2006, at which time Defendant Meyer gave him Motrin. (Document # 118, Exhibit 1 at p. 13).  On April 19, 2006, Plaintiff informed Defendant Meyer that someone had his knee brace confiscated. (Document # 118, Exhibit 1 at p. 11).  On April 24, 2006, Defendant Meyer examined Plaintiff's knee and noted no swelling; nonetheless, Defendant Meyer noted that a knee band was on order in response to Plaintiff's request for the same. (Document # 118, Exhibit 1 at p. 8).  Despite ordering the knee band, however, Defendant Meyer has declared that Plaintiff ambulated well and the band was not a medical necessity. (Declaration of Christopher Meyer attached as Exhibit 7 to Document # 118 ("Meyer Declaration"), at ¶ 23).  In fact, on May 22, 2006, a second x-ray of Plaintiff's right knee

17

revealed no change in Plaintiff's condition from the earlier x-ray of January 4, 2005. (Meyer Declaration at ¶ 17; Document # 118, Exhibit 5).

Based on the foregoing, it is clear that, "[a]s laymen, the jury would not be in a position to decide whether [Plaintiff's knee condition] could be classified as 'serious.'" <u>Harris</u>, 2007 WL 4561480 at * 8. Thus, it is incumbent upon Plaintiff to produce expert medical evidence to substantiate his need for a knee brace. This he has failed to do. Accordingly, Defendants Meyer and Johnson should be granted summary judgment with regard to Plaintiff's Eighth Amendment claim concerning the confiscation and failure to replace his knee brace.

### ii.     Toothpaste Claim

Plaintiff claims that unspecified DOC Defendants removed his "medically prescribed toothpaste which removed Plaintiff of pain due to having sensitive teeth," which allegedly "forced [him] to endure and suffer unwarranted pain for approx. 6 months." (Complaint at p. 17, ¶ 31). As with Plaintiff's knee brace claim, Defendants argue that Plaintiff has failed to produce medical evidence to substantiate his claim that he had a "serious medical need" to which they were allegedly deliberately indifferent.

Defendants acknowledge that Plaintiff's toothpaste was removed from his cell and discarded because it was not the toothpaste generally provided to LTSU inmates, which was placed in a container designed to hinder an inmate's ability to use toothpaste tubes to throw bodily fluids on officers. (Declaration of Michael Zaken attached as Exhibit 1 to Document # 120 ("Zaken Declaration"), at ¶ 9). The toothpaste that was removed was called Sensodyne, which is formulated for sensitive teeth. (<u>See</u> transcript of Plaintiff's deposition attached as Exhibit 6 to Document # 118, at pp. 11-12). However, the toothpaste was not prescribed for Plaintiff, as alleged, but, rather, Plaintiff had obtained permission to purchase the toothpaste from the commissary. (Zaken Declaration at ¶ 14; Plaintiff's deposition transcript at p. 12). When Defendants later learned that Plaintiff had been given permission to have the toothpaste, they

compensated him for its destruction. (Zaken Declaration at ¶¶ 12-13).

Because the toothpaste was not prescribed for Plaintiff, and Plaintiff had merely obtained permission to use it, there is no medical evidence of record upon which a fact finder could determine that Plaintiff had a serious medical need to which Defendants were deliberately indifferent. Since Plaintiff has failed to produce any medical evidence to support his claim, the DOC Defendants should be granted summary judgment in ths regard.

### f.      Excessive Use of Force Claims

Plaintiff has raised three excessive use of force claims that are not barred by the applicable statute of limitations:  (i) a claim that he was assaulted by Defendants Mains, Stoner, Fisher, Steeley, Okorn, Collings, and Faulkner and/or Slepinski on December 6, 2005 (Complaint at pp. 37-39, ¶¶ 106-111); (ii) a claim that he was assaulted by Defendants Rymarowicz, Chapley and Faulkner, on May 2, 2006 (Complaint at pp. 35-36, ¶¶ 100-105); and (iii) a claim that Defendant Nose used excessive force against him on May 9, 2006, allegedly causing an injury to his right knee (Complaint at p. 30, ¶ 86).

"In order for a prisoner to state an Eighth Amendment claim for the excessive use of force by a prison official, he must establish that the force was not applied in a good-faith effort to maintain or restore discipline, but that it was maliciously and sadistically used to cause harm." Wilson v. Shannon, 982 F.Supp. 337, 340 (E.D.Pa. 1997), citing Hudson v. McMillian, 503 U.S. 1, 7 (1992).  However, *de minimis* uses of physical force are excluded from constitutional recognition, provided that the use of force is not  "'repugnant to the conscience of mankind.'" Whitley v. Albers, 475 U.S. 312, 327 (1986), quoting, Estelle v. Gamble, 429 U.S. 97, 106 (1976); see also Reyes v. Chinnici, 54 Fed. Appx. 44, 48 (3d Cir. 2002)("[t]here exists some point at which the degree of force used is so minor that a court can safely assume that no reasonable person could conclude that a corrections officer acted maliciously and sadistically").

### i.      December 6, 2005 Incident

Defendants argue that Plaintiff's claim that he was assaulted on December 6, 2005, is barred by the doctrine of collateral estoppel, because the Court of Common Pleas of Fayette County, Pennsylvania has already heard and rejected Plaintiff's version of events.  This Court agrees.

"The doctrine of issue preclusion, or collateral estoppel, ensures that 'once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to a prior action.'" Burlington v. Northern R. Co. v. Hyundai Merchant Marine Co., Ltd., 63 F.3d 1227, 1231 (3d Cir. 1995), quoting, Montana v. United States, 440 U.S. 147, 153 (1979).  In order to determine whether collateral estoppel/issue preclusion applies, this Court must look to Pennsylvania law.  Grier v. Scarpine, 2008 WL 655865 at * 5 n. 1 (W.D.Pa. 2008), citing Anela v. City of Wildwood, 790 F.2d 1063, 1068 (3d Cir. 1986)("The federal court, in determining the collateral estoppel effect of a state court proceeding, should apply the law of the state where the criminal proceeding took place"); Zuder v. Aigeldinger, et al., 2007 WL 2493810 at * 3 (M.D.Pa. 2007)("... this court must look to Pennsylvania state law with regard to collateral estoppel").

Under Pennsylvania law, collateral estoppel applies when:

(1)  the issue decided in the prior adjudication was identical with the one presented in the later action,

(2)  there was a final judgment on the merits,

(3)  the party against whom the plea is asserted was a party or in privity with a party to the prior adjudication, and

(4)  the party against whom it is asserted had a full and fair opportunity to litigate the issue in question in a prior action.

Zuder, 2007 WL 2493810 at * 3, quoting Laughman v. Pennsylvania, 2007 WL 2345295 at * 10 (M.D.Pa. 2007).  Furthermore, "under Pennsylvania law, a criminal conviction collaterally estops a defendant from denying his acts in a subsequent civil trial."  Ramsey v. Harley, 2002 WL 32349129 at * 1 (E.D.Pa. 2002), citing Shaffer v. Smith, 673 A.2d 872, 874 (Pa. 1996).  See also

Zuder, 2007 WL 2493810 at * 3 ("[a] criminal conviction is clearly included within [the collateral estoppel] rule"); Grier, 2008 WL 655865 at * 5 n. 1 ("[u]nder Pennsylvania law, plaintiff would be collaterally estopped from questioning the facts that support his convictions").

Here, Plaintiff was actually charged with and convicted of Aggravated Assault (18 Pa.C.S. § 2702) in the Court of Common Pleas of Fayette County, in connection with the December 6, 2005 incident involving Defendants Mains, Stoner, Fisher, Steeley, Okorn, Collings, Faulkner and Slepinski. (See Exhibits 12-16 attached to Document # 120).  The court documents from that case clearly indicate that the issue decided by the Fayette County jury was identical to the one Plaintiff presents here – whether he assaulted the Defendants or the Defendants assaulted him in the LTSU on December 6, 2005.  It is also clear that: (i) Plaintiff's criminal conviction was a final judgment on the merits of who assaulted whom; (ii) Plaintiff was a party to the prior criminal action; and (iii) Plaintiff had a full and fair opportunity to litigate the issue of who assaulted whom during his criminal trial.  As a result, Plaintiff's assault claim in this case related to the December 6, 2005, incident is barred by the doctrine of collateral estoppel, and summary judgment should be entered in favor of the DOC Defendants, accordingly.

### ii.    May 2, 2006 Incident

_____On May 2, 2006, Defendants Chapley and Faulkner were escorting Plaintiff from the exercise yard, with the use of a tether attached to the handcuffs securing Plaintiff's hands behind his back. (Complaint at p. 35, ¶¶ 100-101; Declaration of Stephen Chapley attached as Exhibit 27 to Document # 120 ("Chapley Declaration"), at ¶ 11; Declaration of Kevin Faulkner attached as Exhibit 28 to Document # 120 ("Faulkner Declaration"), at ¶ 12).  The tether was held by Defendant Chapley. (Chapley Declaration at ¶ 12; Faulkner Declaration at ¶ 13).

According to Plaintiff, Chapley walked under a stairwell around a pole, causing the tether to hit the pole, which, in turn, "caused the cuffs to dig into Plaintiff's wrist, yank his arms back, and cause extreme amounts of pain." (Complaint at p. 35, ¶ 101).  Chapley then instructed

Plaintiff to follow him under the stairs and around the other side of pole, but Plaintiff refused, stating that he was supposed to follow Defendant Faulkner. (Complaint at pp. 35-36, ¶ 102; Chapley Declaration at ¶¶ 12-14).  Plaintiff claims that Defendant Chapley then became angry and went around the pole to Plaintiff's side, after which he allegedly "yanked the tether so hard that Plaintiff felt instant pain," and "at the same time ... forcefully grabbed Plaintiff by the right arm and yanken [sic] his arm." (Complaint at p. 36, ¶ 102).  Plaintiff alleges that he then asked Defendant Zaken "if he was witnessing what was taking place," at which time Defendants Chapley and Faulkner "slammed Plaintiff['s] face and chest into the steel stairwell." (Complaint at p. 36, ¶ 103).  Plaintiff claims that, after he complained he was being hurt, Defendants Chapley and Faukner "slammed [him] face first into/upon the floor," and then carried him up the stairs by his arms to his assigned cell, where he was allegedly assaulted by Defendants Chapley and Rymarowicz. (Complaint at p. 36, ¶¶ 104-105).

Plaintiff claims that he had to seek medical attention as a result of the alleged assault, and that photos were taken of his injuries. (Complaint at p. 36, ¶ 105).  However, medical records indicate that the only apparent injury was a .25 c, scratch on Plaintiff's knee, which was cleaned, and no further treatment was necessary.  In addition, Plaintiff exhibited full range of motion and had no signs or symptoms of pain. (Document # 120, Exhibit 30 at p. 23).

The absence of a serious injury to the inmate is relevant to this Court's inquiry as to whether excessive force was used.  Hudson, 503 U.S. at 7.  Moreover, the Eighth Amendment "does not protect an inmate against an objectively *de minimis* use of force." See Walker v. James, 2007 WL 210404 at *8 (E.D.Pa. Jan. 23, 2007), citing Smith v. Mensinger, 293 F.3d 641, 649 (#d Cir. 2002).  Allegations of far more force than Plaintiff has alleged have been deemed *de minimis* and dismissed.  See, e.g., Reyes, 54 Fed. Appx. at 48 (where corrections officer punched inmate in the shoulder to avoid being spit on); Thomas v. Ferguson, 361 F.Supp.2d 435, 439-41 (D.N.J. 2004)(finding that, "[e]ven if proven to be true and for no necessary purpose, Defendants' alleged conduct... does not meet the Constitutional standard for a claim of a

malicious and sadistic use of force 'repugnant to the conscience of mankind,'" where inmate alleged he was punched and shoved by corrections officers); Wilson v. Reinhart, 2003 WL 21756393 (D.Del. Jul. 29, 2003)(where officer sprayed inmate in the face with mace).

Here, Plaintiff's allegations of having his handcuffs forcefully yanked and being "slammed" into the stairwell and floor, all of which produced no more than a .25 cm abrasion on his knee, fail to describe a use of force that is "repugnant to the conscience of mankind." Indeed, such a use of force is objectively *de minimis* and insufficient to establish an Eighth Amendment violation. Accordingly, summary judgment should be granted in favor of Defendants Chapley, Faulkner, and Rymarowicz on this claim.

### iii.    May 9, 2006 Incident

On May 9, 2006, a search of Plaintiff's cell was conducted, during which Defendant Nose escorted Plaintiff from his cell to a nearby strip cage. Plaintiff claims that Defendant Nose used excessive force when removing him and caused him to suffer an injury to his right knee. The incident in question was recorded by a handheld camcorder, and a DVD of the recording has been submitted to and reviewed by the Court. (Document # 120, Exhibit 26). The DVD clearly indicates that the force used by Defendant Nose to remove Plaintiff from his cell was minimal. In addition, Plaintiff's medical records indicate that, while Plaintiff complained that his knee had been "hyperextended," no swelling or apparent injury was noted. (Document # 118, Exhibit 1 at p. 9). As a result, the record evidence indicates that the use of force in this matter was objectively *de minimis* and insufficient to state an Eighth Amendment violation. Accordingly, summary judgment should be granted in favor of Defendant Nose on this claim. In addition, since this is the only claim alleged against Defendant Nose, he should be dismissed from this case.

### g.    Verbal Abuse Claim

Plaintiff alleges that Defendant Mains "verbally attacked" him when he allegedly refused Plaintiff commissary in or around November 2005. (Complaint at pp. 25-26, ¶ 69).  To the extent this claim is not barred by the applicable statute of limitations, it is well-settled that the use of words, no matter how violent, is not actionable under 42 U.S.C. § 1983.  See Wright v. O'Hara, 2004 WL 1793018 at *7 (E.D.Pa. Aug. 11, 2004)("[w]here plaintiff has not been physically assaulted, defendant's words and gestures alone are not of constitutional merit")(citations omitted); MacLean v. Secor, 876 F.Supp. 695, 698-99 (E.D.Pa. 1995)("[i]t is well-established that verbal harassment or threats ... will not, without some reinforcing act accompanying them, state a constitutional claim"); Murray v. Woodburn, 809, F.Supp. 383, 384 (E.D.Pa. 1993)("Mean harassment ... is insufficient to state a constitutional deprivation")(listing cases). Thus, Plaintiff's allegation of verbal abuse does not amount to a constitutional violation and summary judgment should be entered in favor of Defendant Mains on this claim.

### 3.    Due Process Claims

Plaintiff has stated two closely related due process claims against the DOC Defendants: (i) a claim that he was placed in SCI-Fayette's LTSU, and remains housed in SCI-Albion's RHU, in violation of his due process rights (Complaint at p. 14, ¶ 17); and (ii) a claim that he was denied due process at "many misconduct hearings," which allegedly caused him to remain in disciplinary custody on a continual basis. (Complaint at p. 31, ¶ 87).  Due to the inter-relationship between these claims, they will be addressed together and considered as one.

Initially, Plaintiff claims that "[d]ue to [his] placement without due process in [the LTSU], he still is facing the effects by being house[d] in the RHU due to the initial unjust placement in the LTSU." (Complaint at p. 14, ¶ 17).  In essence, this claim challenges Plaintiff's continuous confinement in disciplinary custody since April 2004 as a violation of his protected liberty interest.

The Supreme Court has held that a prisoner's state created liberty interest is limited to those situations that impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin v. Conner, 515 U.S. 472, 484 (1995).  In Sandin, the Supreme Court considered the question of whether segregated confinement implicated a constitutional liberty interest and concluded that "discipline in segregated confinement did not present the type of atypical, significant deprivation in which a State might conceivably create a liberty interest." 515 U.S. at 486.  In reaching this conclusion, however, the Sandin court "did not pronounce a *per se* rule."  Mitchell v. Horn, 318 F.3d 523, 531 (3d Cir. 2003).  "In deciding whether a protected liberty interest exists under *Sandin*, we consider the duration of the disciplinary confinement and the conditions of that confinement in relation to other prison conditions." Mitchell, 318 F.3d at 531-32, citing Shoats v. Horn, 213 F.3d 140, 144 (3d Cir. 2000).  In applying these factors, the Third Circuit has reached differing conclusions, "reflecting the fact-specific nature of the *Sandin* test."  Mitchell, 318 F.3d at 532, comparing, *inter alia*, Shoats, 213 F.3d at 144 (eight years in administrative confinement, during which inmate was locked in his cell for all but two hours per week, denied contact with his family, and prohibited him from visiting the library or "participating in any education, vocational, or other organization activities," clearly implicated a protected liberty interest), with Smith v. Mensinger, 293 F.3d 641, 654 (3d Cir. 2002)(seven months of disciplinary confinement did not implicate a liberty interest), and Griffin v. Vaughn, 112 F.3d 703 (3d Cir. 1997) (administrative detention for a period of 15 months, which imposed strict restrictions on outside contact and personal conveniences, did not impose atypical and significant hardship and, thus, did not implicate a liberty interest).

Here, Plaintiff has remained in disciplinary custody, both in the LTSU and the RHU, for a continuous period of over 5½ years.  In addition, Plaintiff's disciplinary custody time significantly exceeds his maximum sentence date, meaning that he will remain in the RHU for the remainder of his sentence. (Document # 137, Plaintiff's Response, at p. 18, Document

# 120 at ¶ 4).  Moreover, the record is replete with evidence that Plaintiff's long-term confinement in disciplinary custody has exposed him to conditions that have caused him to suffer a significant hardship in relation to the ordinary incidents of prison life.  Based on this record, this Court has "no difficulty concluding that [five and one-half] years in [disciplinary] custody, with no prospect of immediate release in the near future, is 'atypical' in relation to the ordinary incidents of prison life, and that [Plaintiff's long-term] confinement subjects him to conditions that differ significantly from 'routine' prison conditions in Pennsylvania state institutions." Shoats, 213 F.3d at 144.  Accordingly, this Court finds that Plaintiff has sufficiently demonstrated that he "has a protected liberty interest that has been adversely affected by his indefinite segregation in [disciplinary] custody."  Id.

Nonetheless, the DOC Defendants argue that "[t]o whatever extent the indefinite nature of Plaintiff's LTSU placement does create an atypical condition and, thus, a limited liberty interest under Sandin, Plaintiff has been afforded all of the process that he is due." (Document # 121 at p. 13).  Specifically, Defendants argue that Plaintiff has received his periodic reviews by the Program Review Committee, which they claim is all the process that is required. (Document # 121 at pp. 13-14).  In support of this argument, Defendants cite the case of Delker v. McCullough, 103 Fed.Appx. 694 (3d Cir. 2004)(holding that the DOC's periodic reviews of status provided inmate due process to which he was entitled for continuing placement in administrative confinement), which, in turn, cites Shoats, 213 F.3d at 147 (holding that periodic reviews by the PRC comport with minimum constitutional standards for due process).  However, the minimal procedures outlined in Shoats and Delker are sufficient "only if the restraint is for administrative – rather than disciplinary – reasons; if the restraint is imposed for disciplinary reasons, the procedures required by Wolff [v. McDonnell, 418 U.S. 539 (1974)] apply."  Pressley v. Blaine, 2009 WL 3842753 at * 6 (Nov. 18, 2009), citing Stevenson v. Carroll, 495 F.3d 62, 70-71 (3d Cir. 2007).  "Therefore, whether [Plaintiff] received periodic reviews by the PRC [is] not relevant to the due process inquiry."  Id.

Under the appropriate standard established by <u>Wolff</u> and its progeny, "due process prohibits the deprivation of a prisoner's liberty interest at a disciplinary hearing unless the prisoner is given:  (1) an impartial decision-making body; (2) twenty-four hour notice of the charges; (3) an opportunity to call witnesses and present documentary evidence; (4) assistance from a representative; and (5) a written decision explaining the evidence relied upon." <u>Pressley</u> at * 4, <u>citing</u> <u>Griffin v. Spratt</u>, 969 F.2d 16, 19 (3d Cir. 1992).  In addition, the disciplinary decision must be supported by at least "some evidence."  <u>Superintendent v. Hill</u>, 472 U.S. 445, 455 (1985); <u>Briggs v. Marbury</u>, 2008 WL 554927 at * 7 (3d Cir. Feb. 28, 2008).

Here, Plaintiff claims that "[a]t his disciplinary hearings over the years [he] was either denied the right to attend the hearing, witnesses and/or assistance attendance, and/or need evidence, – all of which was needed for [him] to properly defend himself, and which would have exonerated [him] of all charges." (Complaint at p. 31, ¶ 87).  In one instance, Plaintiff also alleges that he was "not given twenty four notice prior to attending [a misconduct] hearing to present a defense...." (Document # 137 at p. 22).  The DOC Defendants have failed to respond to these allegations, and the record is devoid of any evidence that would conclusively rebut Plaintiff's allegations.  Given that Plaintiff has made several allegations that, if proven at trial, might establish a violation of his due process rights under <u>Wolff</u> and its progeny, and given that the DOC Defendants have failed to present any evidence to dispute these allegations, summary judgment is not appropriate.  Accordingly, summary judgment should be denied with regard to Plaintiff's claim that his continuous confinement in disciplinary custody, allegedly caused by the lack of due process afforded him at his misconduct hearings, has deprived him of a protected liberty interest in violation of his Fourteenth Amendment due process rights.[2]

---

[2]

The Court notes that Plaintiff has failed to identify the DOC Defendants against whom this claim is asserted.  As a result, in the event this Court's recommendation to deny summary judgment on this claim is adopted by the District Judge, Plaintiff will be required to file an amendment to specifically identify such Defendants so that other uninvolved Defendants may be dismissed from this case.

**4.       Access to Courts Claims**

Plaintiff's Complaint contains several claims that can be fairly classified as access to the courts claims.  These claims consist of:  (i) allegations that he was denied the opportunity to attend two court hearings by Defendants Richter and Mozingo (Complaint at pp. 18-19, ¶¶ 37, 38) ; and (ii) allegations that he was denied commissary, at various times, by one or more of the following Defendants:  Mains, Zaken, Wilson, Kremposky, Faulkner, Chapley, and Beachy.  (Complaint at pp. 25-27, ¶¶ 69-74).

While inmates have the right to adequate, effective, and meaningful access to the courts, Bounds v. Smith, 430 U.S. 817, 828 (1977),  the United States Supreme Court restricted who may bring an access to courts claim in Lewis v. Casey, 518 U.S. 343, 355 (1996).[3]  The Lewis Court held that, in order to state a claim for a denial of the right of access to the courts, a plaintiff must show actual injury.  Id.   The plaintiff must show that, as a result of the defendant's actions, he lost the ability to present an "arguably actionable claim" against the validity of his sentence under direct or collateral appeal or a claim challenging his conditions of confinement in a civil rights action.  Id. at 356.  The Third Circuit has further described the *Lewis* holding:

> to be able to bring a viable claim, the plaintiff inmates ha[ve] to show
> direct injury to their access to the courts.  The Court explained that an
> inmate could show, for example, that a complaint he prepared was
> dismissed for failure to satisfy some technical requirement which,
> because of deficiencies in the prison's legal assistance facilities, he could
> not have known.  Or [he could show] that he had suffered arguably
> actionable harm that he wanted to bring before the courts, but was so
> stymied by the inadequacies ... that he was unable even to file a
> complaint.

Reynolds v. Wagner, 128 F.3d 166, 183 (3d Cir. 1997).

---

[3]

The Lewis Court opined:
> ...*Bounds* does not guarantee inmates the wherewithal to transform themselves into litigating engines
> capable of filing everything from shareholder derivative actions to slip-and-fall claims.  The tools it requires
> to be provided are those that the inmates need in order to attack their sentences, directly or collaterally, and
> in order to challenge the conditions of their confinement.  Impairment of any other litigating capacity is
> simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration.

Id. at 355.

So, under *Lewis*, this Court must determine whether Plaintiff has shown that he lost the ability to present an "arguably actionable claim."  Here, Plaintiff has made a somewhat vague assertion that he was prevented from attending two "important hearings" on April 16 and 18, 2006, due to which he allegedly "lost the opportunity to address matters with his attorney, to the court, and cross-examine witnesses for his defense at trial,- as well as his right to be heard." (Complaint at p. 19, ¶¶ 37-38).  He also claims that he was refused commissary on three different occasions, which he "needed to contact counsel and the courts." (Complaint at pp. 25-27, ¶¶ 69, 71, 73, 74).  None of these claims demonstrate that Plaintiff had an "arguably actionable claim" challenging either the validity of his sentence or conditions of confinement that he lost the ability to pursue due to Defendants' alleged actions.  As a result, summary judgment should be entered on these claims in favor of Defendants Richter, Mozingo Mains, Zaken, Wilson, Kremposky, Faulkner, Chapley, and Beachy.  In addition, Defendant Beachy should be dismissed from this case, as Plaintiff has not asserted any other claim against him.

### 5.   Equal Protection Claims

Plaintiff has raised two claims that have been construed as equal protection claims under the Fourteenth Amendment.  The first is that indigent Muslim inmates were denied the feast after fasting during the month of Ramadan. (Complaint at p16, ¶¶ 25-26).  The second  is related to Defendant Zaken's confiscation of a religious newspaper that was sent to Plaintiff in the mail. The Equal Protection Clause provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. Amend. XIV, § 1. "This is not a command that all persons be treated alike but, rather, 'a direction that all persons similarly situated should be treated alike' "  Artway v. Attorney General of State of N.J., 81 F.3d 1235, 1267 (3d Cir. 1996), quoting City of Cleburne, Tex. v. Cleburne Living Center, 473 U.S. 432, 439 (1985).  "Treatment of dissimilarly situated persons in a dissimilar manner by the government does not violate the Equal Protection Clause."  Klinger v. Department of

Corrections, 31 F.3d 727, 731 (8ᵗʰ Cir. 1994).

"When an inmate asserts an equal protection claim based on the allegedly disparate treatment of different religious groups, the governing standard is whether the disparate treatment is reasonably related to a legitimate penological interest." Fraise, 283 F.3d at 521 quoting DeHart, 277 F.3d at 61.  However, as a threshold matter, in order to establish an equal protection violation, the plaintiff must "...demonstrate that [he has] been treated differently by a state actor than others who are similarly situated simply because [he] belongs to a particular protected class." Keevan v. Smith, 100 F.3d 644, 648 (8ᵗʰ Cir. 1996).

With regard to his first claim, Plaintiff alleges that "[a]fter the holy month of Ramadan was over indigent Muslims were denied the feast non-indigent Muslims received." (Complaint at p. 16, ¶ 25).  Although not entirely clear, it appears that Plaintiff is challenging the DOC's policy of requiring Muslim inmates in general population to pay for their participation in a celebratory feast after Ramadan, which, Plaintiff claims, adversely affects the ability of indigent Muslim inmates to participate in the feast. (See Declaration of Daniel Burns attached as Exhibit 32 to Document # 120 ("Burns Declaration"), at ¶ 15).  However, Plaintiff is not in general population and, thus, is unaffected by this policy.  As a result, Plaintiff lacks standing to bring an equal protection claim in this regard.  Moreover, the DOC Defendants point out that inmates in the LTSU and RHU are not permitted to participate in any religious feasts, regardless of their religion.  In this respect, Muslims inmates in disciplinary custody, such as Plaintiff, are not treated any differently than other similarly situated inmates. (See Declaration of Adam Crumb attached as Exhibit 33 to Document # 120 ("Crumb Declaration"), at ¶ 16.  For these reasons, Defendants should be granted summary judgment with regard to Plaintiff's equal protection claim concerning the post-Ramadan feast.

With regard to Plaintiff's second equal protection claim concerning Defendant Zaken's alleged confiscation of a religious newspaper, Plaintiff makes the bald assertion that "[t]he action of Zaken did not occur with any other religious group regarding said material." (Complaint at pp.

21-22, ¶ 52).  In response, the DOC Defendants indicate that, under LTSU rules, all publications received in the mail were held and reviewed to determine if they were truly religious and/or legal in nature. (See Zaken Declaration at ¶ 22).  Zaken declares that, to the best of his ability, he applied these rules fairly and without discrimination to any race or religion, and did not treat Islamic publications differently than those of other religions. (Id.).  Plaintiff has not provided any evidence to show that, unlike him, other similarly situated LTSU inmates of different religions received their religious publications, without incident.  Thus, Plaintiff is not able to establish an equal protection claim in this regard and summary judgment should be entered in favor of Defendant Zaken.

### 6. First Amendment Free Speech Claims

Plaintiff has stated a number of claims challenging the manner in which the DOC Defendants have handled his incoming and outgoing mail, which have been construed as First Amendment freedom of speech claims.

"Prisoners retain a constitutionally protected right to reasonable correspondence with the outside world" under the First Amendment.  Alexander v. Gennarini, 144 Fed. Appx. 924, 926 (3d Cir. 2005), citing Procunier v. Martinez, 416 U.S. 396, 408-09 (1974), overruled on other grounds, 490 U.S. 401 (1989).   Nevertheless, "the legitimate governmental interest in the order and security of penal institutions justifies the imposition of certain restraints on inmate correspondence."  Martinez, 416 U.S. at 412-13.  With regard to outgoing correspondence from inmates, the Supreme Court established a two-part "strict scrutiny" test to determine if censorship of prisoner mail is justified:  (1) the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression; and (2) the limitation of First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved. Id. at 413.  However, regulations affecting an inmate's right to receive incoming correspondence or publications are held to a less

stringent "reasonableness" standard, requiring only that they be reasonably related to legitimate penological interests under the four-part test enunciated in <u>Turner v. Safley</u>, 482 U.S. 78 (1987). <u>Thornburgh v. Abbott</u>, 490 U.S. 401, 413-14 (1989).  <u>See</u> <u>also</u> <u>Nasir v. Morgan</u>, 350 F.3d 366, 371 (3d Cir. 2003)(applying <u>Martinez</u> strict scrutiny standard to outgoing mail and the <u>Turner</u> reasonableness standard to incoming mail).

### a.      Outgoing Mail Claims

Here, two of Plaintiff's mail claims challenge the treatment of his outgoing mail: (i) a claim that a letter he sent was improperly returned to him in January 2006 (Complaint at pp. 20-21, ¶¶ 47-48); and (ii) a claim that Defendant Crumb opened his mail before returning it to him in or around October 2006 (Complaint at p. 21, ¶¶ 49-50).

With regard to the first outgoing mail claim, Plaintiff states that he "tried to mail a letter to the Prison Society regarding an assaultive [corrections officer], and the letter was sent back to Plaintiff as return to sender."  (Document # 137, Plaintiff's Response, at p. 44).  In his Complaint, Plaintiff alleges that "the letter was properly addressed, yet was returned with reasons to Plaintiff, with notice stating 'return to sender, no forward order on file, unable to forward, return to sender.'" (Complaint at p. 21, ¶ 48).  Plaintiff goes on to state that he "later had the letter mailed by his mother and received a reply with the same address being as the receiver, which was addressed with the same address." (Document # 137 at p. 44).  In support of this argument, Plaintiff has submitted copies of his original envelope addressed to "Mr. Jim Syphers" at the "PA Prison Society," which was returned to him on or about January 10, 2006, and an envelope addressed to Plaintiff and postmarked May 13, 2006, which contains a return address for "PA Prison Society" that corresponds to the address on Plaintiff's January 2006 submission. (<u>See</u> Exhibit 53 attached to Document # 145, Plaintiff's Exhibits, at p. 52).  Thus, it appears Plaintiff is claiming that the reason that was given by the DOC Defendants for returning his original letter to him - that the letter, as addressed by Plaintiff, could not be delivered to the

recipient - was false.  This argument has no merit, however, as it is evident that the "return to sender, no forward order on file" notation on the envelope addressed by Plaintiff in or around January 2006, was imprinted by the U.S. Postmaster, not the DOC Defendants, as Plaintiff suggests.  Thus, the DOC Defendants cannot be held responsible for the fact that the letter was returned to him, and summary judgment should be enter in their favor on this claim.

Plaintiff's second outgoing mail claim concerns Defendant Crumb's handling of mail that "was sent back to Plaintiff from the mail room due to an error by the mail room staff." (Complaint at p. 21, ¶ 49).  In particular, the record indicates that the mail room staff erroneously sent two of Plaintiff's outgoing letters back to his unit, mistakenly believing Plaintiff had already used his allotment of 10 postage paid envelopes for the month of October 2006. (See Exhibit 50 attached to Document # 145, Plaintiff's Exhibits, at p. 42).  Plaintiff claims, when the letters were returned to his unit, Defendant Crumb "took it upon himself to open said mail prior to returning it to him." (Id. at ¶ 50).  In response, Defendant Crumb has submitted a Declaration in which he offers the following explanation for his actions:

> 5.     For security reasons, inmates are not allowed to communicate with one another through the mail.  In order to circumvent this restriction, inmates have been known to write the name/number of the inmate with whom they want to communicate in the return address portion of an envelope, and write a fake address on the addressee section of the envelope.  When the mail is returned due to the fake address, it will be returned to the inmate listed on the return address.
>
> 6.     Inmates have also been known to use this method to pass contraband to each other.  This poses a significant risk to the safety and security of the institution.
>
> 7.     Accordingly, it was formerly the practice of the LTSU staff to open all "return to sender" mail to ensure that it was a legitimate "return to sender" letter and not an attempt to do what is described above.  The mail was not read; it was simply opened to ensure that it was legitimate "return to sender" mail and that it did not contain contraband.
>
> 8.     During the time that this was the practice in LTSU, I honestly believed that the practice was in accordance with policy.

9.      On or about October 16, 2006, I was present for the opening of at least one such letter that was returned to [Plaintiff].  The mail was not read, and was delivered to [Plaintiff] once it was determined that it was legitimate "return to sender" mail.

10.     [Plaintiff] complained about his mail being opened.  I then looked into the applicable policy, and determined that such mail should be opened by the security team rather than unit staff.

11.     I sent [Plaintiff] a letter detailing what had happened....

(Crumb Declaration at ¶¶ 5-11).[4]

Under the strict scrutiny test outlined in Martinez, supra, this Court must determine whether (1) the practice of opening an inmate's returned mail before returning it to him furthered an important or substantial governmental interest unrelated to the suppression of expression; and (2) the limitation of Plaintiff's First Amendment freedom was no greater than necessary to protect the particular governmental interest involved.  Here, Defendant Crumb has adequately explained the security concerns that led him to open and inspect the two letters that were being returned to Plaintiff, which ths Court finds to be an "important governmental interest unrelated to the suppression of expression."  Moreover, this Court has no trouble upholding the practice of opening an inmate's  returned mail to ensure its legitimacy, without reading it, as the least restrictive means of protecting those security concerns.  Accordingly, summary judgment should be entered in favor of Defendant Crumb with regard to Plaintiff's claim in this regard.


**b.      Incoming Mail Claim**

Plaintiff's remaining mail claim challenges the Defendant Zaken's treatment of his incoming mail.  Specifically, Plaintiff claims that Defendants Zaken confiscated and/or ordered

---

4

In his letter to Plaintiff, Defendant Crumb informed Plaintiff that unit staff will no longer open mail, but that "[a]ll mail that is of a suspicious nature will be confiscated and given to the security office for inspection." (See attachment to Crumb Declaration). In addition, after acknowledging the mail room's error in returning Plaintiff's  letters that were later opened by Defendant Crumb, Defendant Kremposky provided Plaintiff with two additional postage paid envelopes to replace the two that had been damaged due to the error. (Exhibit 50 attached to Document # 145, Plaintiff's Exhibits, at p. 42).

the confiscation of Plaintiff's religious newspapers while he was in the LTSU.  In particular, the record indicates that several issues of a  religious newspaper, known as "Final Call," were confiscated from Plaintiff's mail in or around September 2006, at Zaken's direction. (See Exhibit 47 attached to Document # 145, Plaintiff's Exhibits, at pp. 19-21, 24-28).  The record indicates further that inmates in the LTSU were restricted from receiving all publications and newspapers that were not religious or legal in nature, and that Defendant Zaken had determined on, at least, one occasion that the Final Call newspaper was not a religious newspaper. (See Exhibit 47 attached to Document # 145, Plaintiff's Exhibits, at p. 21).  For his part, Defendant Zaken has declared that he "handled [Plaintiff's] mail in accordance with policy and procedures at all times," and has "no knowledge that would lead [him] to believe that [Plaintiff's] mail and publications were not processed in accordance with applicable policy and procedure, including the rules then in place in the LTSU." (Zaken Declaration at ¶ 21).

As noted earlier, regulations affecting an inmate's right to receive incoming correspondence or publications are held to a less stringent "reasonableness" standard, requiring only that they be reasonably related to legitimate penological interests under Turner, supra. Under the Turner analysis, the Court must consider (i) whether there is a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it; (ii) whether inmates have alternative means of exercising the constitutional right at hand; (iii) the impact that accommodation of the constitutional right would have on other prisoners, guards, and prison resources in general; and (iv) the availability of alternatives to the regulation. Turner, 482 U.S. at 89-90.  See also Waterman v. Farmer, 183 F.3d 208 (3d Cir. 1999).  Here, however, it is not necessary to apply the Turner analysis to the LTSU's mail and publication restrictions that were followed by Defendant Zaken, as such restrictions have already been upheld by the Supreme Court in Beard v. Banks, 548 U.S. 521, 533 (2006).  Accordingly, summary judgment should be entered in favor of Defendant Zaken with regard to Plaintiff's claim that he confiscated and/or ordered the confiscation of Plaintiff's incoming religious

newspaper while he was in the LTSU.  In addition to the foregoing, Defendant Linderman, the mail room supervisor, should be terminated as a Defendant in this case, as these mail-related claims are the only cognizable claims that may be asserted against him.

### 7.      Retaliation Claims

Plaintiff claims that many of Defendants' alleged actions were done in retaliation for his filing of numerous grievances and lawsuits against them.  "Retaliation for the exercise of constitutionally protected rights is itself a violation of rights secured by the Constitution actionable under section 1983."  See White v. Napoleon, 897 F.2d 103, 111-12 (3d Cir.1990). "Government actions, which standing alone, do not violate the Constitution, may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an individual for exercise of a constitutional right."  Mitchell v. Horn, 318 F.3d 523, 530 (3d Cir. 2003), quoting Allah v. Seiverling, 229 F.3d 220, 224-25 (3d Cir. 2000).

In order to state a prima facie case of retaliation, a prisoner must demonstrate:

> 1) the conduct in which he was engaged was constitutionally protected;
>
> 2) he suffered "adverse action" at the hands of prison officials[5]; and
>
> 3) his constitutionally protected conduct was a substantial or motivating factor in the decisions to discipline him.

Carter v. McGrady, 292 F.3d 152, 157-58 (3d Cir. 2002), quoting Rauser v. Horn, 241 F.3d 330, 333 (3d Cir. 2001).  Following the satisfaction of a prima facie case of retaliation, the burden then shifts to the defendants to demonstrate, by a preponderance of the evidence, that their actions would have been the same, even if Plaintiff were not engaging in the constitutionally

---

[5]

To show an "adverse action," the plaintiff must demonstrate that defendants' action were "sufficient to deter a person of ordinary firmness from exercising his [constitutional] rights."  Allah v. Al-Hafeez, 208 F.Supp.2d 520,535 (E.D. Pa. June 24, 2002), quoting Allah v. Seiverling, 229 F.3d at 225.  See also Dixon v. Brown, 38 F.3d 379, 379 (8th Cir. 1994) (a plaintiff "need not show a separate, independent injury as an element of the case ... because the retaliatory disciplinary charge strikes at the heart of an inmate's constitutional right to seek redress of grievances, [and] the injury to his right inheres in the retaliatory conduct itself.").

protected activities.  Carter, 292 F.3d at 158.  "Once a prisoner has demonstrated that his exercise of a constitutional right was a substantial or motivating factor in the challenged decision, the prison officials may still prevail by proving that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest."  Rauser, 241 F.3d at 334.  In evaluating a prison official's opinion, "[p]rison administrators should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security."  Bell v. Wolfish, 441 U.S. 520, 547 (1979).

Here, Plaintiff has alleged the following retaliation claims against:  (i) Defendant Johnson, for confiscating his knee brace; (ii) Defendant Meyer, for failing to return or replace his knee brace in a timely fashion; (iii) Defendants Richter and Mozingo, for refusing to allow him to attend court hearings on April 16 and 18, 2006; (iv) Defendant Zaken, for confiscating and/or ordering the confiscation of his incoming religious newspapers; (v) Defendants Richter, Burton, Holman, Tift, and Mozingo, for stealing some of his personal property and dousing it in the shower, throwing his underwear "upon the filthy tier," and stepping on his medically prescribed toothpaste; (vi) Defendants Wilson, Zaken, Burns, Harris, Krysevig, and Armel, for forcing him to undergo a strip search each time he entered and exited his cell in retaliation for his "peaceful hunger strike;" (vii) Defendants Scire, Kushner, and Wilson, for placing him on grievance restriction; and (viii) Defendants Zaken, Wilson, Burns, Nickelson, and Krysevig, for denying him the opportunity to speak to his dying mother.  Each of these claims will be addressed, in turn.

### a.      Defendant Meyer

In his Amended Complaint, Plaintiff alleges that he was assaulted by several DOC staff members on March 18, 2005, after which he sought medical attention from Defendant Meyer, who allegedly refused to treat him. (Amended Complaint at ¶¶ 122-124).  As a result, Plaintiff

filed a grievance against Defendant Meyer.  Plaintiff later sought medical attention for his knee in or around February 2006, after his knee brace was confiscated by Defendant Johnson. (Id. at ¶ 125).  At that time, Plaintiff claims Defendant Meyer told him that "he did not forget the grievance Plaintiff filed against him regarding the March 18, 2005, incident," and "let it be known to Plaintiff that he would personally see to it that Plaintiff don't [sic] receive the knee brace." Id. at ¶ 127-128).  The Court previously determined that these allegations sufficiently stated a *prima facie* claim of retaliation to overcome Defendant Meyer's motion to dismiss. (See Document # 98, Report and Recommendation, at pp. 9-10).

Defendant Meyer has now submitted a Declaration stating that, on April 24, 2006, he informed Plaintiff "that a band for his knee was on order," and that "[o]nce the order for the band for [Plaintiff's] knee was placed, [he] had no reason to believe that the order would not be filled." (Meyer Declaration at ¶¶ 16, 22).  Defendant Meyer declares further that he is "not specifically aware of any grievances filed by [Plaintiff] with regard to his medical care," and "[n]one of [his] actions with regard to [Plaintiff] were connected to any grievances or documents [Plaintiff] may have submitted." (Meyer Declaration at ¶¶ 9-10).  Thus, "[a]ny delay in obtaining a band for [Plaintiff's] knee was inadvertent...." (Meyer Declaration at ¶ 24).  Defendant Meyer has also submitted medical records verifying that a knee brace was, in fact, ordered for Plaintiff by Defendant Meyer on April 24, 2006. (See Exhibit 1 attached to Document # 118, at p. 8).

Based on the foregoing, it is apparent that Defendant Meyer's actions were taken without regard to Plaintiff's filing of a grievance against him the previous year.  In fact, Defendant Meyer's act of ordering a knee brace for Plaintiff contradicts Plaintiff's claim that "he would personally see to it" that Plaintiff didn't receive the knee brace.  Thus, the Court finds that Defendant Meyer has met his burden of proving that he would have taken the same actions even if Plaintiff had not engaged in the constitutionally protected activity of filing a grievance.  Accordingly, summary judgment should be entered in favor of Defendant Meyer on this claim.

The remaining retaliation claims are asserted against DOC Defendants.  In their motion

for summary judgment, the DOC Defendants have chosen to disregard, without conceding, the first two prongs of the *prima facie* test, and have focused their attack on Plaintiff's alleged inability to meet the third prong of the test.  As a result, this Court will assume, for purposes of Defendants' motion, that Plaintiff has met the first two prongs, and will focus attention on Plaintiff's ability to show that his constitutionally protected conduct was a substantial or motivating factor in Defendants' decisions to take the alleged adverse actions.

### b.      Defendant Johnson

Plaintiff claims that Defendant Johnson "unjustly took [his] knee brace ... due to Plaintiff complaining to staff about Johnson's actions while working around Plaintiff." (Complaint at p. 18, ¶ 34).  No other allegations or evidence have been put forth by Plaintiff to link Defendant Johnson's actions to Plaintiff's alleged protected activity of "complaining to staff."  While "[a] suggestive temporal proximity between the protected activity and an alleged retaliatory act may be sufficient to meet the causal link requirement of the prima facie case." Allah v. Al-Hafeez, 208 F.Supp.2d at 535 (citations omitted), Plaintiff has given no indication of the temporal relationship between his alleged complaints to staff, and Defendant Johnson's confiscation of his knee brace.  A simple statement that complaints were made, without more, is insufficient to establish a link between the protected activity and the challenged action.  See Allah, 208 F.Supp.2d at 536 ("a mere scintilla of evidence that there is a causal relationship between [the] protected activity and [the challenged action]" is insufficient).  Thus, Plaintiff has failed to satisfy the third prong of his retaliation claim against Defendant Johnson, and summary judgment should be entered in favor of Defendant Johnson on this claim.

### c.      Refusing Plaintiff's Attendance at Court Hearings

Plaintiff claims that Defendants Richter and Mozingo refused to allow him to attend

"important court hearings" on April 16 and 18, 2006, "out of retaliation." (Complaint at pp. 18-19, ¶¶ 37-38).  In his Declaration submitted with his response to the DOC Defendants' motion for summary judgment, Plaintiff added that "this retaliatory act [was done] for complaints [he'd] made against LTSU staff." (Document # 155 at ¶ 16).  Once again, Plaintiff has failed to establish any causal or temporal relationship between the complaints he made against LTSU staff and the Defendants' alleged actions.  Thus, Plaintiff has failed to satisfy the third prong of his retaliation claim against Defendants Richter and Monzingo, and summary judgment should be entered in their favor.

### d.      Confiscation of Religious Newspaper

Plaintiff claims that, "sometime around Oct. or Sept. 2006, [Defendant] Zaken "wrongfully and unlawfully confiscated [his] incoming mail/religious newspaper" and "directed his staff to do the same," in retaliation "for his numerous complaints against DOC staff." (Complaint at pp. 21-22, ¶¶ 51, 52, 56).  No further evidence has been submitted by Plaintiff to establish any type of causal or temporal relationship between his complaints against DOC staff and the alleged confiscation of his incoming mail/religious newspapers.  As a result, summary judgment should be entered in favor of Defendant Zaken with regard to this claim.

### e.      Mistreatment of Personal Property

Plaintiff claims that, "on or about August 23, 2007," Defendants Richter, Burton, Holman, Tift and Mozingo "retaliated against [him] for exercising his rights" by stealing some of his personal property and dousing it in the shower, throwing his underwear "upon the filthy tier," and stepping on his medically prescribed toothpaste. (Complaint at p. 23, ¶ 62).  In response, the Defendants argue that it was not possible for them to have taken any of the described actions on August 23, 2007, because Plaintiff was incarcerated at SCI-Forest on that date and none of them had ever worked there. (Document # 121 at p. 7).  However, in his Declaration, Plaintiff clarified

that the alleged actions took place on August 23, 2006, rather than 2007. (Document # 155 at ¶ 90). This date clarification nullifies Defendants' contention that it was "physically impossible" for them to have committed the alleged acts on the date alleged in the Complaint. Nevertheless, Plaintiff has once again failed to establish a connection between Defendants' alleged actions and any constitutionally protected activity. At most, Plaintiff has indicated in his Declaration that the alleged acts were done "out of retaliation for several complaints I've made against LTSU staff." (Id.). This bald assertion, without more, is not sufficient to meet Plaintiff's burden to establish the third prong of his retaliation claim. Thus, summary judgment should be entered in favor of Defendants Richter, Burton, Holman, Tift and Mozingo, on this claim. In addition, Defendants Richter, Burton, Holman, Tift and Mozingo should be terminated as Defendants in this case, as no other claims remain against them.

### f.      Strip Searches

Plaintiff claims that Defendants Wilson, Zaken, Burns, Harris, Krysevig, and Armel, retaliated against him for going on a "peaceful hunger strike" by forcing him to "strip naked whenever exiting his assigned cell, and upon returning to the block." (Complaint at p. 25, ¶ 66-67). In this instance, it is, at least, arguable that Plaintiff has satisfactorily met his burden of demonstrating a relationship between the protected activity – the hunger strike – and Defendants' alleged actions, such that Plaintiff may be found to have stated a *prima facie* case of retaliation. Thus, Defendants must prove, by a preponderance of the evidence, that their actions were reasonably related to a legitimate penological interest, apart from Plaintiff's protected activity. In this regard, Defendants Zaken and Burns have each submitted a Declaration in which he avers the following:

> All inmates in Level 5 housing units, including those that were housed in the former LTSU, are required by policy and/or procedure to submit to a strip search prior to leaving his cell, and are also required to submit to a strip search upon returning to the unit.
>
> This requirement is in place to promote the safety and security of the

41

> institution.  Among other things, it furthers this interest by hindering the
> introduction of contraband into the secure units of the institution.

(Zaken Declaration at ¶¶ 27-28; Burns Declaration at ¶¶ 5-6).

The foregoing Declarations establish that the challenged strip searches would have been conducted absent Plaintiff's protected conduct "for reasons reasonably related to a legitimate penological interest."  Rauser, 241 F.3d at 334.  Accordingly, summary judgment should be entered in favor of Defendants Wilson, Zaken, Burns, Harris, Krysevig, and Armel, on this claim.

### g.     Grievance Restriction

Plaintiff claims that "[e]ach time while Plaintiff was housed at SCI Fayette and placed on grievance restriction by Scire, Kushner, and/or Wilson, it was due to retaliatory acts by staff for Plaintiff exercising his free speech rights." (Complaint at p. 27-28, ¶ 76).  With regard to this claim, it is difficult to argue that there is no causal relationship between the filing of grievances and being placed on grievance restriction.  Under certain circumstances, one necessarily leads to the other, although not necessarily with retaliatory animus.  In this case, the basis for having placed Plaintiff on grievance restriction is explained by Defendant Scire in her Declaration, as follows:

> 4.     Pursuant to [DC-ADM 804], an inmate who deliberately misuses the grievance process by filing more than 5 frivolous or fabricated grievances within a thirty-day period may be restricted to filing no more than one grievance each 15 working days.
>
> 5.     Inmates are not placed on grievance restriction merely because they file grievances; rather they are placed on grievance restriction because they deliberately misuse the process as defined in DC-ADM 804.
>
> 6.     On or about May 17, 2006, I prepared a memo that placed [Plaintiff] on grievance restriction. [Plaintiff] was placed on grievance restriction because it was determined that he had filed twelve frivolous grievances in a thirty-day period.
>
> 7.     Thus, [Plaintiff] was placed on grievance restriction because he had deliberately misused the grievance process. The act of filing grievances was not the motivation; it was the frivolous nature of those grievances that resulted in his being placed on grievance

42

restriction.

(Declaration of Carol A. Scire attached as Exhibit 41 to Document # 120 ("Scire Declaration"), at ¶¶ 4-7)

Based on the foregoing, it is clear that Defendants placed Plaintiff on grievance restriction for reasons reasonably related to a legitimate penological interest. Accordingly, summary judgment should be entered in favor of Defendants Scire, Kushner and Wilson with regard to this claim.

### h.      Denial of Opportunity to Speak to Dying Mother

Plaintiff claims that "out of retaliation," Defendants Zaken, Wilson, Burns, Nickelson, and Krysevig "for several months denied Plaintiff to speak with his dying mother to whom he was her only child, best friend, and very close too." (Complaint at p. 28, ¶ 77). No further elaboration of this claim has been provided, other than Plaintiff's statement in his response that Defendants' alleged actions in this regard were "due to Plaintiff's numerous complaints against DOC officials and planned lawsuit." These allegations are far too vague and conclusory to establish a causal relationship between Plaintiff's protected activity and Defendants' alleged actions. As a result, Plaintiff has failed to satisfy the third prong of his retaliation claim, and summary judgment should be entered in favor of Defendants Zaken, Wilson, Burns, Nickelson, and Krysevig on this claim.

### III.     CONCLUSION

For the foregoing reasons, it is respectfully recommended that:

1.      Defendant Chris Meyer's motion for summary judgment [Document # 115] should be granted, and Defendant Meyer should be terminated from this case;

2.      The DOC Defendants' motion for summary judgment [Document # 119] should be granted in part and denied in part, as follows:

a.      The motion should be denied with regard to Plaintiff's

43

claim that his continuous confinement in disciplinary custody, allegedly caused by the lack of due process afforded him at his misconduct hearings, has deprived him of a protected liberty interest in violation of his Fourteenth Amendment due process rights; and

b.   The motion should be granted with regard to all other claims asserted by Plaintiff in this case.

By virtue of the foregoing, it is also recommended that the following Defendants be terminated from this case, as the claims against them have been recommended for dismissal: Shaffer, Maue, Haley, Link, Rohrabaugh, Petrosky, Nose, Beachy, Richter, Burton, Holman, Tift, Mozingo, and Linderman.

It is further recommended that Plaintiff be ordered to file an amended complaint pertaining solely to the remaining due process claim in this case, specifying the Defendants against whom such claim is asserted and the specific allegations against each.  All remaining Defendants not so named should then be dismissed from this case.

In accordance with the Magistrate Judges Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72.D.2 of the Local Civil Rules for Magistrate Judges, the parties are allowed ten (10) days from the date of service to file written objections to this report.  Any party opposing the objections shall have ten (10) days from the date of service of objections to respond thereto. Failure to timely file objections may constitute a waiver of some appellate rights.  See Nara v. Frank, 488 F.3d 187 (3d Cir. 2007).

/s/ Susan Paradise Baxter
SUSAN PARADISE BAXTER
United States Magistrate Judge

Dated:  November 30, 2009

cc:   The Honorable Sean J. McLaughlin
      United States District Judge

44